

2004 Decisions

**Opinions of the United
States Court of Appeals
for the Third Circuit**

6-24-2004

# Highlands Ins Co v. Hobbs Grp LLC

Precedential or Non-Precedential: Precedential

Docket No. 03-1760

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Highlands Ins Co v. Hobbs Grp LLC" (2004). *2004 Decisions.* Paper 538.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/538

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

No. 03-1760

HIGHLANDS INSURANCE
COMPANY f/k/a HIGHLANDS
INSURANCE GROUP, INC.,

Appellant

v.

HOBBS GROUP, LLC; ROBERT
MARKEL; NISSAN PERLA;
FRONTIER INSURANCE COMPANY
and GLOBAL RISK
MANAGEMENT SERVICES, INC.,

Appeal from the United States District
Court for the District of New Jersey
(D.C. Civil Action No. 00-cv-00686)
District Judge: Honorable Garrett E.
Brown, Jr.

Argued March 12, 2004

Before: SLOVITER and NYGAARD,
Circuit Judges, and SHADUR[1], District
Judge

---

[1]  Honorable Milton I. Shadur,
United States District Court Judge for the
Northern District of Illinois, sitting by
designation.

(Opinion filed June 24, 2004 )

Louis R. Moffa, Jr.  (Argued)
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000, Suite 500
Main Street
Voorhees, NJ 08043-4636

Attorney for Appellant

Michael O. Kassak  (Argued)
Stephen Trzcinski
White and Williams LLP
222 Haddon Avenue, Suite 300
Westmont, NJ 08108

Attorneys for Appellee,
Hobbs Group, LLC

Stephen G. Rhoads  (Argued)
Kristen E. Polovoy
Montgomery McCracken Walker &
Rhoads, LLP
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, NJ 08002

Attorneys for Appellee, Global
Risk Management Services, Inc.

OPINION OF THE COURT

SHADUR, District Judge.

In February 1999 Highlands
Insurance Company, Inc. ("Highlands")
issued a policy to Olympic Limousine, Inc.
("Olympic") that provided Olympic with

commercial automobile insurance coverage, subject to a $2.5 million aggregate annual deductible (as to which Olympic was effectively self-insured). Before the policy was cancelled by Highlands just seven months later, Highlands found itself responsible for handling in excess of $3 million in claims against Olympic. Unfortunately for Highlands, Olympic never paid the $2.5 million deductible on those claims. Even more unfortunately for Highlands, Olympic had also failed to pay the $62,500 premium required to button up a surety arrangement that would have protected Highlands against such nonpayment.

In response to those events, Highlands filed a federal court diversity action against a slew of defendants, including (1) Hobbs Group, LLC ("Hobbs"), the insurance broker that had arranged for the underlying liability insurance policy between Highlands and Olympic and had also dealt with Highlands in the course of the surety bond procurement process and (2) Global Risk Management Services, Inc. ("Global"), the surety bond broker that had worked with Hobbs and with proposed surety Frontier Insurance Co. ("Frontier"). Eventually Highlands' action was whittled down to three counts–claims of negligent misrepresentation and negligence against Hobbs and a claim of negligence against Global. Both Hobbs and Global then moved for summary judgment pursuant to Fed. R. Civ. P. 56 ("Rule 56"). After full briefing, the district court concluded that under New Jersey law neither Hobbs nor

Global owed any duty to Highlands, and it therefore granted summary judgment dismissing all three claims.

Highlands now appeals those rulings, and we have jurisdiction under 28 U.S.C. §1291. We hold that under New Jersey law Hobbs did owe a duty to Highlands that rendered the latter's negligence claims viable, so we reverse and remand for a trial on those claims. But we find that the district court was correct in holding that no such duty ran from Global to Highlands, and we therefore affirm the district court's dismissal of Global as a defendant.

Facts

Olympic was a limousine and livery service that operated in and around Manhattan. It sought out Hobbs in late 1998 to act as its insurance broker in securing a new commercial automobile insurance policy to take over when Olympic's old policy expired in early 1999. Hobbs in turn got in touch with Highlands,[2] and the parties began to

---

[2] Because of a fronting agreement between Highlands and Virginia Surety Company, Inc. ("Virginia Surety"), Olympic's insurance coverage was technically a contract between Olympic and Virginia Surety. But because Highlands was completely responsible for all financial and administrative aspects of the policy, we refer to Highlands as Olympic's insurance

discuss terms for potential coverage. After much negotiation Highlands and Olympic (through Hobbs) agreed on a policy that included the following relevant provisions:

1. Highlands would initially process and pay for claims against Olympic. Each month Highlands would then invoice Olympic for the claims it had paid and Olympic would reimburse Highlands, subject to a $250,000 loss deductible per vehicle/$1 million coverage per vehicle rate. But under no circumstances would Olympic's annual reimbursement obligation to Highlands exceed $2.5 million.

2. Olympic would secure a surety bond (with Highlands as the obligee) in the amount of Olympic's $2.5 million aggregate annual deductible.[3]

With the expiration date of Olympic's existing policy approaching rapidly, Hobbs communicated with Global to see if it would be interested in procuring the surety bond that Highlands required under its policy with Olympic. Global was

_____

carrier.

[3] Although Olympic never actually signed all the documents that would have legally bound it to obtain the surety bond, at all times both Hobbs and Global (not to mention Highlands) appeared to be working under the basic assumption that the surety bond requirement was integral to the final policy to which Olympic and Highlands agreed.

indeed interested. Working as an agent for Frontier, Global locked in Frontier as the expected surety for Olympic's deductible and relayed that commitment back to Hobbs. Although it had already agreed to be Olympic's surety, Frontier expressly conditioned the issuance of the actual surety bond on two events: Several parties were required to sign indemnification agreements, and Olympic had to pay the first year's premium of $62,500.

On February 28, 1999 the insurance policy between Olympic and Highlands took effect, and Highlands dutifully began to pay out on Olympic's claims as they accrued. But although Highlands then invoiced Olympic for the reimbursements that Olympic owed Highlands under the terms of the policy, Olympic did not honor its reimbursement obligation.

For a variety of reasons (including Highlands' realization that it had exposed itself to a far greater risk than it had originally anticipated, as well as other legal compliance issues with its policy), Highlands began efforts to cancel the policy with Olympic as early as April 1999. It nonetheless remained responsible for claims against Olympic until September 1999, when the cancellation took effect.

But neither Hobbs nor Global ever informed Highlands that even though Global had prepared the surety bond (on Frontier's behalf), the bond was never executed and was ultimately "cancelled

flat"[4] because of Olympic's failure to pay the premium on the bond. Highlands was completely unaware until well after it began the cancellation process with Olympic that it was not protected, as the obligee under the surety bond, from the huge loss that resulted from Olympic's nonpayment. And it is that failure to inform that Highlands asserts gives rise to Hobbs' and Global's liability.

## Rule 56 Standard and Standard of Review

We review de novo the decision to grant summary judgment and use the same Rule 56 standards as did the district court (Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co., 998 F.2d 1224, 1230 (3d Cir. 1993)). Those standards establish that the Rule 56 movant bears the burden of showing the absence of any "genuine issue of material fact" (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)): that is, the failure to provide "evidence such that a reasonable jury could return a verdict for the nonmoving party" (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)), even while "accepting its evidence as true and drawing all justifiable inferences from the evidence in its favor" (Sameric Corp. of Del. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998)).

---

[4] That locution denotes a cancellation ab initio, as though the bond had never been in force.

## New Jersey's Rules of Decision

As always in diversity cases, a federal court must apply the substantive law of the forum state–and where the state's highest court has not spoken definitively on a particular issue, the federal court must make an informed prediction as to how the highest state court would decide the issue (Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993)). To that end the federal court may consider a wide range of reliable sources, including relevant state precedents, analogous decisions and reasoned dicta, as well as the policies and doctrinal trends informing and emerging from those decisions (Scotts African United Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church, 98 F.3d 78, 92 (3d Cir. 1996)). But the court must also be mindful not "to expand state law in ways not foreshadowed by state precedent" (City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002)).

In New Jersey (as in all other jurisdictions) any tort of negligence requires the plaintiff to prove that the putative tortfeasor breached a duty of care owed to plaintiff and that plaintiff suffered damages proximately caused by that breach (Weinberg v. Dinger, 524 A.2d 366, 373 (N.J. 1987)). In particular, under New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false

information and that plaintiff incurred damages proximately caused by its reliance on that information (<u>Karu v. Feldman</u>, 574 A.2d 420, 425 (N.J. 1990)). In that respect a defendant may be liable (because it owes a duty) to any reasonably foreseeable recipient who relies on the information (<u>id.</u>).

For Highlands to prevail on any of its claims, then, it must first show that the defendant being considered owed it a relevant duty of care. That determination is quintessentially a question of law for the court (<u>City Check Cashing, Inc. v. Mfrs. Hanover Tr. Co.</u>, 764 A.2d 411, 416 (N.J. 2001)).

Because the New Jersey Supreme Court has not squarely addressed whether a surety bond broker owes a duty to the obligee of that bond, under <u>Erie</u> principles we must predict whether that court would recognize such a duty under the circumstances presented here. In that respect the district court determined as a matter of law that Highlands' claims of negligent misrepresentation against Hobbs and of negligence against Hobbs and Global could never succeed because New Jersey does not impose a duty of care on either party with respect to Highlands. We review that prediction and application of New Jersey tort law de novo (<u>Clark</u>, 9 F.3d at 327).

Highlands relies primarily on <u>Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc.</u>, 638 A.2d 1288 (N.J. 1994) to argue that both Hobbs and Global owed a duty to

Highlands. It is conventional wisdom that an insurance broker must "act with reasonable skill and diligence in performing the services of a broker" with respect to its insured (<u>id.</u> at 1291). Lapses in that duty that can give rise to liability include, but are not limited to, either (1) failing completely to arrange for an insurance policy or (2) delivering a policy that is void, materially deficient or otherwise does not provide the coverage the broker agreed to procure (<u>id.</u>; <u>Glezerman v. Columbian Mut. Life Ins. Co.</u>, 944 F.2d 146, 150 (3d Cir. 1991)). <u>Carter Lincoln-Mercury</u>, 628 A.2d at 1291-92 emphasizes that although the relationship between an insured and its broker is most often contractual in nature, claims by an insured against its broker are not based on a privity relationship but are premised on the tort concept of negligence in failing to procure the appropriate coverage. That concept is fundamental to one of <u>Carter Lincoln-Mercury</u>'s central holdings: the principle that the broker's duty owed to insured parties is also owed to other loss payees who (although not in privity with the broker) are within the zone of harm emanating from its activities (<u>id.</u> at 1294-95, 1297).

<u>Carter Lincoln-Mercury</u>, <u>id.</u> at 1294-95 identifies two key elements that should guide courts in delineating the boundaries of that zone of harm: foreseeability and fairness. Foreseeability takes into account the relationship between the plaintiff and the broker, the nature of the risk and the defendant's ability and opportunity to exercise care and avert

5

harm (id. at 1294). And the fairness aspect requires a court to make a value judgment as to whether establishing a broker's duty in relationship to a particular plaintiff is fair based on policy considerations and the public interest (id.). After analyzing those two aspects under the circumstances at issue there, Carter Lincoln-Mercury, id. at 1298 ultimately held that the insurance broker in that case did owe a duty to the loss payee of the insurance policy that the broker had negligently procured for its insured.

Whether the broker's duty in the insurance context translates to the surety context before us requires that we consider in the first instance whether surety relationships are equivalent to insurance relationships under New Jersey law. There are certainly many similarities between the two. Like insurance relationships, surety relationships have three central players–the principal obligor, the insured (or obligee of the surety bond) and the insurer (or surety) (In re Liquidation of Integrity Ins. Co., 657 A.2d 902, 907 (N.J. Super. Ct. App. Div. 1995), aff'd 685 A.2d 1286 (N.J. 1996)).

Indeed, in many contexts New Jersey explicitly equates surety bonds with insurance polices. For example, a New Jersey insurance rates statute expressly defines "policy of insurance" to include surety bonds (N.J. St. Ann. §17:29A-1(e) (2004)). And in the liquidation of an insurance corporation, the claims of surety bondholders are accorded priority together with insurance policyholders' claims (In re Liquidation of Integrity Ins. Co., 598 A.2d 940, 943-44 (N.J. Super. Ct. Ch. Div. 1991)). New Jersey courts have also stated more generally that because it is long settled in New Jersey that surety is insurance, surety bondholders are equivalent to insurance policyholders (id.; Aetna Cas. & Sur. Co. v. Int'l Re-Ins. Corp., 175 A. 114, 120 (N.J. Ch. 1934)).

To be sure, in the case at bar Hobbs was an insurance broker for Olympic and procured a policy from Highlands. As between those two companies Olympic was the insured and Highlands was the insurer. But the critical coverage for purposes of the current lawsuit is that provided (or, more accurately, not provided) by the surety bond–and that coverage was intended to serve Highlands' benefit. From that perspective Olympic was to be the principal obligor, Frontier was to be the surety (the insurer in the surety context) and Highlands was to be the obligee of the surety bond (the insured in the surety context).

Hobbs and Global staunchly maintain that even if a surety relationship equates to an insurance relationship, the Carter Lincoln-Mercury-defined duty was never intended to protect insurers such as Highlands. But that mistakes mere form (the "insurance company" label) for substance: In the context at issue in this case, Highlands is not an insurer qua insurer. Instead what is relevant is that Highlands is an obligee on a surety bond, even though it also happens to be in the insurance business generally.

6

As Highlands would have it, our inquiry should end with the conclusion that the Carter Lincoln-Mercury-prescribed duty extends to all surety bond brokers and issuers, so that Hobbs and Global necessarily owed a duty to Highlands as the third-party obligee on the surety bond. But we must of course proceed with caution when wading into the predictive Erie waters, and the New Jersey courts avoid treating questions of duty in a conclusory fashion. Both of those things being true, we proceed beyond our determinations (1) that New Jersey law draws strong parallels between insurance policies generally and surety bonds specifically and (2) that Highlands is exactly the type of insured/obligee that is entitled to look to the Carter Lincoln-Mercury analysis as a basis for determining the existence of a duty (Weinberg, 524 A.2d at 374). Instead we must proceed with the same type of foreseeability-plus-fairness analysis that the New Jersey Supreme Court carried out in Carter Lincoln-Mercury in evaluating the existence or nonexistence of a duty to third parties such as Highlands. And for that purpose, of course, we consider Hobbs and Global separately.

Hobbs

In terms of foreseeability, the propriety of recognizing a duty of care owed by Hobbs to Highlands is obvious. For one thing, the technical agent-principal relationship between Hobbs and Olympic in no way vitiates the impact of the close working relationship between Hobbs and Highlands in the transaction at issue, as evidenced by the nature and volume of the communications between them (Weinisch v. Sawyer, 587 A.2d 615, 618 (N.J. 1991)). Next as to the nature of the risk, by definition the absence of protection for Highlands in the event of Olympic's default is precisely the peril that would necessarily follow from the failure to have obtained the surety bond on which Highlands was to be the obligee. And finally, our determination that Highlands was within Hobbs' zone of harm is significantly influenced by the fact that Hobbs had both abundant opportunities and ample ability to advise Highlands that it was mistaken in its belief (an entirely reasonable one) that it was protected by a surety bond with Frontier, a lack of protection that stemmed from Olympic's nonpayment of the premium on the bond (Carter Lincoln-Mercury, 638 A.2d at 1294).

Much of Highlands' correspondence with Hobbs clearly shows that it was under the impression that the process of securing the surety bond was progressing without a hitch. Most notably, an April 1, 1999 e-mail from Highlands to Hobbs reporting on the transaction said in part "we have the bond in place," an explicit communication to Hobbs of Highlands' belief that Olympic's surety bond was in effect. Hobbs had numerous communications with Highlands after that April 1 e-mail about a variety of other matters, but not once did Hobbs mention to Highlands that Olympic had not paid the premium needed to cement Frontier's

7

surety bond obligation.[5]

Indeed, the multiple requests for payment running from Hobbs to Olympic show unequivocally that throughout the course of its communications with Highlands Hobbs was fully aware that Olympic had not paid the premium on the surety bond and that Frontier would not issue the bond until that premium was paid. Yet Hobbs did not even make the cost-free effort to notify Highlands of Olympic's delay in paying the premium by copying Highlands on any of those communications.

At every step of the way Hobbs had both the opportunity and the ability to advise Highlands that it was not protected by any surety bond because Olympic had not paid the premium. And its ongoing total silence invited Highlands to rely on Hobbs' conduct that otherwise suggested the surety bond placement process had been completed as planned. Without doubt Highlands fell squarely within the foreseeable zone of harm from Hobbs'

---

[5] That silence on Hobbs' part under the circumstances just mentioned, and in the face of the other factors mentioned hereafter, is especially egregious because even a whisper to that effect would have eliminated the problem and the disastrous consequence that has prompted this litigation–Highlands could promptly have paid the $62,500 premium itself (as it had the right to do), thus shifting the risk to Frontier.

conduct (President v. Jenkins, 814 A.2d 1173, 1185 (N.J. Super. Ct. App. Div. 2003)).

With foreseeability thus firmly established, we turn to the fairness branch of the Carter Lincoln-Mercury analysis. In that regard we next look to New Jersey public policy to forecast whether the New Jersey Supreme Court would find it in the public interest to create that duty (639 A.2d at 1294-95). We conclude that it would.

That court's tradition of holding insurance professionals to high standards of care confirms its strong public policy focus on protecting parties who deal with such professionals (Aden v. Fortsh, 776 A.2d 792, 805 (N.J. 2001)). True enough, Highlands' own involvement in the insurance industry, rather than its being a general member of the public as was involved in Carter Lincoln-Mercury, may cut against the imposition of an actual fiduciary responsibility on Hobbs' part vis-a-vis Highlands (see Aden, 776 A.2d at 800-01). But that does not at all control the fairness concerns at issue here, as Hobbs suggests–it merely calls for the examination of other important public interest considerations (Glezerman, 944 F.2d at 150).

In the case of an unsophisticated insured, we are primarily concerned that the individual will suffer harm while adrift in the insurance world and at the mercy of a professional with far greater expertise. Although that spectre is obviously not

universally present as to an entity such as Highlands, the public policy value that uniformly requires brokers to carry out the instructions given to them to the best of their abilities applies with equal force whether a broker is dealing with an individual unschooled in insurance complexities or is conducting business with a savvy entity such as Highlands (Aden, 776 A.2d at 805-06). And finally, to shift from the general to the particular, the imposition of a broker's duty in the surety context hones in on the primary purpose that underscores the entire surety relationship: protecting the obligee of the surety bond in the case of a default by the principal (United States ex rel. Don Siegel Constr. Co. v. Atul Constr. Co., 85 F.Supp.2d 414, 418 (D. N.J. 2000)).

In sum, our analysis in the terms taught by Carter Lincoln-Mercury–consideration of the elements of both foreseeability and fairness–has led us to conclude that the New Jersey Supreme Court would find, as to both torts asserted by Highlands against Hobbs, that the latter owed a duty to Highlands as the obligee of Olympic's surety bond.[6] We go on to address (and to dispatch) Hobbs' several fallback arguments.

---

[6]    We find no reason to differentiate, in Carter Lincoln-Mercury terms, as between negligence actions generally and negligent misrepresentation actions specifically (see H. Rosenblum, Inc. v. Adler, 461 A.2d 138, 145, 153 (N.J. 1983)).

First, Hobbs asserts that Highlands has not created a genuine issue of material fact as to the other elements of either of its tort claims against Hobbs. To deal with that contention, we need to identify those other elements.

As for the negligent misrepresentation claim, the New Jersey caselaw that allows such a claim to be based on the defendant's silence or suppression of truth rather than on some affirmative misrepresentation (Strawn v. Canuso, 657 A.2d 420, 429 (N.J. 1995)) is not limited to special relationship situations such as those involving transactions within explicit fiduciary relationships, transactions where a quasi-fiduciary relationship develops either through the express conduct of the parties or other circumstances particular to that individual transaction or transactions (such as insurance) whose nature inherently requires such a duty regardless of the parties' intentions (Berman v. Gurwicz, 458 A.2d 1311, 1313-14 (N.J. Super. Ct. Ch. Div. 1981)). In addition, the required duty of disclosure may also arise in any situation called for by good faith and common decency (Maertin v. Armstrong World Indus., Inc., 241 F.Supp.2d 434, 461 (D. N.J. 2002), conforming to the holding in City Check Cashing, 764 A.2d at 417).

Evaluation of the existence or nonexistence of a duty of disclosure in the present situation calls for the weighing of factors essentially identical to those already drawn from Carter Lincoln-

Mercury: foreseeability and fairness. We need not then repeat the analysis–what has been said before also supports the grounding of Highlands' negligent misrepresentation claim in breach-by-omission. And more briefly as to Highlands' general negligence claim against Hobbs, it is hornbook law that a broker's failure to obtain adequate coverage can support a claim that the broker has breached its duty (Weinisch, 587 A.2d at 618).

Against that backdrop it is plain that Highlands has adduced enough evidence to raise genuine issues of material fact as to both breach and causation for each tort. Several of Hobbs' communications–including communications to Highlands that referred to the surety bond in ways that made it appear the bond had already been secured, communications to Highlands that omitted any reference to the problems with the surety bond that Hobbs knew about, and communications to Olympic that could have been but were not shared with Highlands–could reasonably support a finding that Hobbs breached its duty to Highlands (see Glezerman, 944 F.2d at 151). And Highlands' totally plausible statement that if Hobbs had only said the surety bond was not in place because of the nonpayment of the premium, Highlands would itself have paid the premium, raises at least a genuine issue of material fact about causation.

Hobbs tries to escape the impact of all that evidence via several arguments, all sharing the common theme that some factor other than Hobbs' failure to inform Highlands of Olympic's nonpayment of its premium (including perhaps Highlands' own asserted negligence) was assertedly an intervening or superseding cause of Highlands' loss. But all those efforts fail, because questions of negligence (including comparative negligence) and causation are within the jury's province in all but the most exceptional situations (Fleuhr v. City of Cape May, 732 A.2d 1035, 1041 (N.J. 1999); Vega v. Piedilato, 713 A.2d 442, 459 (N.J. 1998)). And for Rule 56 purposes it is not our function to make credibility determinations or otherwise to weigh the evidence (Petruzzi's IGA Supermkts., 998 F.2d at 1230).

In short, there are at least genuine issues of material fact precluding summary judgment on the negligence and causation aspects of Highlands' claims against Hobbs. And finally, because Highlands has paid over $3 million in claims against Olympic during the coverage period (all of which were under the policy's loss-per-occurrence limit and would therefore have been covered by the Olympic deductible had the surety bond been in place), it has at a minimum raised a genuine issue of material fact as to damages.

Next Hobbs asserts that Highlands' tort claims are precluded under Saltiel v. GSI Consultants, Inc., 788 A.2d 268 (N.J. 2002), which dictates that conduct within a relationship defined solely by contract cannot give rise to a tort claim against the allegedly breaching party or its agent

10

unless that party has some independent duty to the aggrieved party outside the scope of the contract (id. at 279-80). Hobbs seeks to support that argument by pointing out that although Highlands never had any formal contractual relationship with Hobbs, it did have a contractual relationship with Olympic. And Hobbs as an insurance broker was unequivocally Olympic's agent (Weinisch, 587 A.2d at 618).

But that contention by Hobbs misses the mark completely in all events, in light of our determination that the duty Hobbs owed Highlands is wholly independent of any contractual obligations it might have had to Highlands as a function of Hobbs' status as an agent of Olympic. In that respect Saltiel, 788 A.2d at 280-81 itself explicitly lists the Carter Lincoln-Mercury duty as an example of an independent duty that would negate the Saltiel-announced limitation.

Nothing daunted, Hobbs also advances the suggestion that once Highlands had sufficient notice that the surety bond was not in place, its decision to retain Olympic's premiums and to continue processing Olympic's claims amounted to a ratification that effectively waived Highlands' right to rescind the contract based on the absence of the bond (Ajamian v. Schlanger, 89 A.2d 702 (N.J. Super. Ct. App. Div. 1952)). Hobbs maintains that its March 3, 1999 fax to Highlands that did not contain any information indicating that the bond had been executed and completed gave

Highlands sufficient notice to trigger the ratification scenario.[7]

While ratification may sometimes be determined as a question of law (see, e.g., Garden State Bldgs., L.P. v. First Fid. Bank, N.A., 702 A.2d 1315, 1324 (N.J. Super. Ct. App. Div. 1995)), that is not the case here. Highlands' April 1 communication reflecting its belief that the surety bond had already been placed puts into dispute, for resolution by a jury, any contention that the March 3 fax sequence–which reflected that Hobbs was sending a specimen surety form to Highlands simply to approve the wording and which plainly evidenced Highlands' clear intention to be designated as the obligee on the final documents–somehow placed Highlands on notice that the surety bond was not being arranged as expected. Absent a finding of notice to Highlands that there was a potential problem with the surety agreement, its continued performance under its insurance policy with Olympic could not be viewed as a

---

[7]    Even though the text discussion assumes purely arguendo that ratification in New Jersey forecloses a party from bringing all tort and contract claims, as compared with just precluding the party from seeking the equitable remedy of rescission (as in Ajamian), such cases as Bilotti v. Accurate Forming Corp., 188 A.2d 24, 33, 34 (N.J. 1963) and Merchants Indem. Corp. v. Eggleston, 170 A.2d 505, 513 (N.J. 1962) suggest otherwise.

ratification (Merchants Indem., 179 A.2d at 514; Martin Glennon, Inc. v. First Fid. Bank, N.A., 652 A.2d 199, 205 (N.J. Super. Ct. App. Div. 1995)). Again the existence of a genuine issue of material fact defeats a summary judgment in Hobbs' favor.

Finally, Hobbs urges that Highlands' claims are not really independent tort claims directly against Hobbs, but rather seek indemnification from Hobbs for insurance claims that Highlands had paid on behalf of Olympic. On that premise Hobbs asserts that Highlands cannot prevail, because once it cancelled Olympic's insurance policy it became partially responsible for Olympic's failure to live up to its obligation to pay the premium on the surety bond, so as to be precluded under New Jersey law from recovering its losses in indemnity (Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 510 A.2d 1152, 1158-59 (N.J. 1986)).

That attempted reclassification of Highlands' tort actions is unpersuasive. After all, Highlands fronted the payment for the claims against Olympic as it was required to do by its insurance policy. That being so, the recovery Highlands seeks from Hobbs consists of plain old-fashioned damages in tort, flowing directly from Highlands' performance without the benefit of the protection that should have been provided by the surety bond–a deprivation that a factfinder can determine should be attributed to Hobbs' malfeasance.

We have thus rejected each of Hobbs' alternative grounds for summary judgment. We therefore reverse the district court's grant of judgment in Hobbs' favor and remand for the resolution at trial of Highlands' claims against Hobbs.

Global

In Global's case the Carter Lincoln-Mercury analysis cuts in the opposite direction. Far less discussion is needed to explain why that is so.

Throughout the entire process of arranging for Frontier to act as the surety on Olympic's deductible, Global's line of communication ran only between Frontier and Hobbs: At no point did Global ever interact directly with Highlands. By contrast, Hobbs' line of communication stretched from Global to Highlands.

It is plain that communication with Highlands was wholly outside the scope of Global's professional role, which was to help Hobbs secure Frontier as the surety on Olympic's deductible (see Zielinski v. Professional Appraisal Assocs., 740 A.2d 1131, 1135 (N.J. Super. Ct. App. Div. 1999)). Hence it would be an impermissible stretch to hold that Global "had particular knowledge or reason to know" that Highlands was at risk of being harmed from its conduct, a key factor that Carter Lincoln-Mercury employed in finding the existence of a duty based on a zone of harm theory.

Absent any communication or other relationship between Highlands and

Global, it would do violence to any reasonable notion of foreseeability to saddle Global with liability because it did not go outside the scope of its undertaking by informing Highlands directly about the problems with securing the surety bond (City Check Cashing, 411 A.2d at 416-17; Carter Lincoln-Mercury, 638 A.2d at 1298). And because foreseeability is a necessary (though not a sufficient) precondition to the imposition of a duty flowing from an insurance or surety broker to a third party, we need not address the other–the fairness–precondition (Carvalho v. Toll Bros. & Developers, 675 A.2d 209, 213 (N.J. 1996)). Highlands' negligence claim against Global therefore fails as a matter of law.

Conclusion

We have followed the teaching of Carter Lincoln-Mercury in identifying the existence or nonexistence of a duty running to Highlands as the expected obligee of a surety bond–the subject of its defeated expectations. In those terms we REVERSE the district court's grant of summary judgment in Hobbs' favor and REMAND for the resolution of Highlands' claims at trial, and we AFFIRM the district court's grant of summary judgment in favor of Global, which is dismissed as a defendant in this action.