64 N.J. Super. 134 (1960)
165 A.2d 543
DEERHURST ESTATES, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
MEADOW HOMES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 1960.
Decided November 10, 1960.
*140 Before Judges GOLDMANN, FREUND and HETFIELD.
Mr. Saul J. Zucker argued the cause for defendant-appellant (Messrs. Kristeller, Zucker, Lowenstein & Cohen, attorneys).
Mr. Leslie P. Glick argued the cause for plaintiff-respondent (Messrs. Rubenstein & Glick, attorneys).
The opinion of the court was delivered by FREUND, J.A.D.
This is a suit to recover damages for an alleged breach of warranty in a contract for the sale of land. The issues of liability and damages were determined separately by the Law Division, pursuant to R.R. 4:43-2. The two trials, heard without jury, resulted in findings that defendant had breached certain warranties and was liable to plaintiff in the sum of $29,700. Defendant appeals from both of these judgments.
*141 Plaintiff corporation is owned by Joseph Lenkowsky, who on June 14, 1954 entered into a written contract with defendant Meadow Homes, Inc. (Meadow), represented by its owner, M. Michael Meadow, for the purchase of 267 lots in East Brunswick Township, the purchase price amounting to $425 per lot. On June 18, pursuant to express permission contained in the contract, Lenkowsky assigned his interest to plaintiff. On August 2, 1954 defendant conveyed the lots to Deerhurst Estates (Deerhurst) for $40,000 cash, taking a three-year note secured by a purchase money mortgage for the balance.
While the contract of sale contains 11 warranties and representations, the significant ones for the purposes of this appeal are sections 3(b) and 3(d), which read as follows:
"3. Seller represents and warrants that:

* * * * * * * *
(b) The sub-division as outlined in the above mentioned site plan has been tentatively approved by the Planning Board of East Brunswick Township and all other agencies having jurisdiction over sub-division of lands.

* * * * * * * *
(d) There is no regulation under or provision of zoning, Planning, Building Permit, Building Ordinances of East Brunswick Township which is inconsistent with the original submission of the entire sub-division by seller as outlined by the above site plan as to lot sizes, street layout, grades, street improvements, or other requirements so that there is nothing in said ordinances or regulations thereunder that will prohibit the filing and approval of the remaining 7 sections and the erection thereon of buildings similar to those erected in Sections I and III and similar to the plans filed or proposed for Sections IV and V."
Deerhurst alleged, and the trial court found, 50 N.J. Super. 140 (Law Div. 1958), that both of the above warranties were breached, and that plaintiff was thereby put to great additional expense in enlarging 198 of the 267 lots and otherwise complying with more stringent official specifications than the warranties would have led Deerhurst to expect. In stating his conclusion that Meadow did not have the promised "tentative approval," the trial judge ruled as a *142 matter of law that the parties' use of the phrase, "tentative approval," in section 3(b) of the contract, was a reference to N.J.S.A. 40:55-1.18, a section of the Municipal Planning Act of 1953, which took effect on January 1, 1954. The judge declined to consider parol evidence proffered by defendant in an effort to demonstrate that by use of the word "tentative" the parties had merely intended a synonym for "preliminary" and not a word of art. Said the judge (at 50 N.J. Super. 144-145):
"There is sharp conflict in the testimony as to whether the cited statute, supra, was specifically referred to by the contracting parties in connection with the phrasing of paragraph 3(b) of the document, and whether or not declaration was then made on behalf of defendant that no approval had been had by it under such statute and that defendant in that respect could sell and was offering to sell only what it had and no more. In view of the conclusions of law herein arrived at, a finding of fact upon such conflict would be without significance, for the reason that what would be thus established would tend to show not the sense of the writing but an intent wholly unexpressed therein."
Before considering Meadow's assertion that the trial court erred in the above ruling, we must examine defendant's initial argument. Meadow's contention is that since Deerhurst, through its agent, Lenkowsky, concededly had full knowledge of the alleged false warranty prior to receipt of the deed, the subsequent acceptance of the deed constitutes a waiver of the right to recover damages for the false warranty. In the alternative, Meadow argues that upon learning of the breach, Deerhurst was faced with an election, and because it elected to proceed with the closing of title, it is estopped to deny that Meadow has adequately performed.
Although many of the terms of the contract of sale, including the pertinent warranties, sections 3(b) and 3(d), were not expressly incorporated in the deed, it is clear that defendant cannot rely on the traditional notion of merger by deed  that in contracts for the sale of land, acceptance of a deed is deemed prima facie full execution of an executory contract to convey. Long v. Hartwell, 34 N.J.L. 116 *143 (Sup. Ct. 1870); Dieckman v. Walser, 114 N.J. Eq. 382 (E. & A. 1933). In the first place, covenants which are collateral to and independent of the contract form an exception to the doctrine of merger. A covenant may be considered collateral either because it has no relation to the title, possession, quantity or emblements of the transferred lands, Dieckman v. Walser, supra, 114 N.J. Eq., at p. 386, or because delivery of the deed is only a part of the performance contemplated by the contract. Curtiss-Warner Corp. v. Thirkettle, 99 N.J. Eq. 806 (Ch. 1926), affirmed 101 N.J. Eq. 279 (E. & A. 1927); Campbell v. Heller, 36 N.J. Super. 361, 367 (Ch. Div. 1955). It does not appear to be seriously contested that the relevant warranties in the instant case are collateral to and independent of the contract. But cf. Bogert v. Citizens First National Bank and Trust Co., 131 N.J.L. 218, 224 (E. & A. 1944). All doubt is eliminated, however, by section 5 of the contract, which provides that:
"All terms and conditions and warranties not performed before or at closing of title shall survive said closing and remain in full force and effect."
This contractual clause evidences conclusively an intention that the warranties here involved should survive the transfer of certain of the rights and obligations from contract to deed. It is the intention of the parties which is to be given effect, as the doctrine of merger is simply a rule of presumed intention. See West Paterson Sand & Gravel Co. v. Great Notch Corp., 107 N.J.L. 309 (E. & A. 1931); Annotation, 38 A.L.R.2d 1310, 1317 (1954); Restatement, Contracts, § 240(2) (b) (1932). But while section 5 effectively ensures that none of the rights and obligations contained in the contract of sale will be extinguished by their omission from the deed, it does not in itself preclude a waiver of, or election to forego, any of these rights.
Meadow urges that Deerhurst, having learned prior to the closing of title that Meadow had not obtained and was not *144 going to obtain "tentative approval" (in the statutory sense of the term), was faced with the choice of whether to proceed with the contract or to rescind and sue for fraud and deceit. Meadow insists that, by electing to proceed, Deerhurst waived all rights accruing by way of the breach.
Meadow has confused the remedy for fraud and deceit with the remedy of action on the contract for breach of warranty. They are mutually exclusive. Bankers Indemnity Insurance Co. v. Henry Henkel & Sons, 118 N.J. Eq. 244, 247 (Ch. 1935). That this action is of the latter variety is clear from both the pretrial order and the opinion of the court below. 50 N.J. Super., at p. 141, supra.
In the instance of a fraudulently induced contract, a knowing misstatement has been made, on the basis of which the defrauded party signs the instrument. Assuming that the contract is still executory when knowledge of the fraud is obtained, the majority view requires the defrauded party either to affirm the contract or to rescind it. See Annotation, 13 A.L.R.2d 807, 856 (1950). The theory behind this position is that if the defrauded party chooses to proceed with the contract as it stands, he has suffered no injury by reason of the fraud. Lembeck v. Gerken, 86 N.J.L. 111, 117 (Sup. Ct. 1914). Rather than allow the injured party "to speculate upon the fraud of the other party * * * [and] recover for self-inflicted injuries * * *," the law concludes that he has waived his right to damages for the fraud. Thompson v. Libby, 36 Minn. 287, 31 N.W. 52 (Sup. Ct. 1886). An alternative theory is that the decision to proceed with performance in the face of the fraud amounts to the making of a new contract. Simon v. Rossier, 127 A.2d 394, 395 (D.C. Mun. Ct. App. 1956). An exception to this rule may apply where the defrauded party is unable to rescind without prejudice. See Thompson Crane & Trucking Co. v. Eyman, 123 Cal. App.2d 904, 267 P.2d 1043, 1047 (D. Ct. App. 1954).
But a contract of sale which contains the respective rights and obligations of the parties, in the form of warranties *145 and representations, presents, upon breach of warranty, a different problem. Here fraud is not essential in order to present the innocent party with optional remedies. While a substantial defect in the proposed performance of the defaulting party may discharge the innocent party from his duty to perform, see Corn Exchange, etc., Phil v. Taubel, 113 N.J.L. 605, 616 (E. & A. 1934), or entitle him to rescind, see Reutler v. Ramsin, 91 N.J.L. 262 (E. & A. 1917); Burns Trading Corporation v. Blue Front Market, 17 N.J. Super. 61 (Law Div. 1951), he may also choose to proceed with the contract and recover in damages for the injuries caused by the breach. See Restatement, Contracts, § 410, comment (b). Cf. Miller & Sons Bakery Co. v. Selikowitz, 8 N.J. Super. 118, 122 (App. Div. 1950). Simply because he is informed by the defaulting party that the latter cannot or will not perform one of his obligations under the contract, the injured party, by choosing to proceed nonetheless, obviously does not manifest agreement that the performance received is in full satisfaction of all contractual obligations. See 3 Williston, Contracts, § 700, pp. 2018-19 (rev. ed. 1936).
Waiver consists of the intentional relinquishment of a known right. West Jersey Title, etc., Co. v. Industrial Trust Co., 27 N.J. 144, 152 (1958). It is a voluntary, clear and decisive act, implying an election to forego some advantage which the waiving party might have insisted on. George F. Malcolm, Inc. v. Burlington City Loan & Trust Co., 115 N.J. Eq. 227, 232 (Ch. 1934). It is clear that Deerhurst did not voluntarily release any of its rights against Meadow for the warranties which were breached by the latter. The evidence is uncontradicted that at the time of the closing, Deerhurst's attorney advised his client, in the presence of Meadow's representative and counsel, that it could proceed with the contract without relinquishing any of its rights. Written notice to Meadow of such an intention was contained in a letter from Deerhurst's attorney to Meadow's counsel, dated August 4, 1954  two days after the closing  asserting that the matter of "tentative approval" was a still-pending *146 obligation on Meadow's part. Mere assent to receipt of the deed without proof of assent to the breach is insufficient evidence of waiver. Desz v. Lincoln Savings Bank of Brooklyn, 174 Misc. 263, 19 N.Y.S.2d 663 (App. T. 1940) reversed on other grounds 260 App. Div. 949, 23 N.Y.S.2d 699 (App. Div. 1940).
But defendant argues that Deerhurst's intention is irrelevant; that faced with the choice of proceeding or receding  two inconsistent remedies  plaintiff's election of one automatically precludes subsequent recovery for the breach which first presented that choice.
The doctrine of election properly applies where a party is confronted with a choice of alternative and inconsistent rights and remedies. See Walter E. Heller & Co., Inc. v. Hammond, 52 N.J. Super. 332, 337 (App. Div. 1958), modified 29 N.J. 589 (1959); 3 Williston, Contracts, § 683, p. 1969. While application of the doctrine is not dependent on the intention of the "electing" party, 3 Williston, Contracts, § 684, p. 1971, although knowledge that a choice exists may be essential, cf. Levy v. Massachusetts Accident Co., 127 N.J. Eq. 49, 51 (E. & A. 1940), the remedies must in fact be inconsistent and not concurrent. Adams v. Camden Safe Deposit & Trust Co., 121 N.J.L. 389, 395 (Sup. Ct. 1938); Nazzaro v. Globe & Republic Ins. Co., 127 N.J. Eq. 279 (E. & A. 1940).
The difficulty with Meadow's contention is that the remedies here sought by Deerhurst are in no way inconsistent. Deerhurst did not seek rescission, a remedy based on avoidance of the contract, and at the same time endeavor to treat defendant's obligation as valid and subsisting. Rescission and confirmation of the transaction are obviously inconsistent remedies. Ajamian v. Schlanger, 20 N.J. Super. 246 (App. Div. 1952), reversed on other grounds 14 N.J. 483 (1954). Rather, Deerhurst attempted to treat the contract as valid and to seek damages for its breach. Cf. Ganger v. Moffett, 12 N.J. Super. 186 (App. *147 Div.), affirmed 8 N.J. 73 (1951); 3 Williston, Contracts, § 723, p. 2058.
From what has been said, it should be clear that, in the instant case, there is no equitable estoppel, as urged by Meadow. Estoppel in pais is a doctrine grounded in equity, to the effect that one who performs an act or takes a position upon which it is intended that another rely cannot repudiate the act or the position where an unjust and unconscionable result would flow from such repudiation. New Jersey Suburban Water Co. v. Town of Harrison, 122 N.J.L. 189, 194 (E. & A. 1939); West Jersey Title, etc., Co. v. Industrial Trust Co., supra, 27 N.J., at p. 153. There was no repudiation on the part of Deerhurst in the case at bar. It took the position throughout that it was entitled to the benefit of all of the warranties included in the contract of sale and preserved beyond the closing date by section 5. Meadow cannot claim prejudice through good-faith reliance on any position which has subsequently been discarded. Cf. Smith v. National Commercial Title, etc., Co., 120 N.J.L. 75, 83 (E. & A. 1938).
Defendant's next contention is that the trial court erred in holding as a matter of law that the reference to "tentative approval" in section 3(b) of the contract was to the statutory procedure set forth in N.J.S.A. 40:55-1.18. The pertinent portions of the statute read as follows:
"The governing body or the planning board, as the case may be, may tentatively approve a plat showing new streets or roads or the resubdivision of land along a mapped street. This tentative approval shall confer upon the applicant the following rights for a three-year period from the date of the tentative approval:
(1) that the general terms and conditions upon which the tentative approval was granted will not be changed.
(2) that the said applicant may submit on or before the expiration date the whole or part or parts of said plat for final approval."
Meadow draws attention to the approval by the East Brunswick Planning Board, on December 13, 1950, of a "Preliminary Plot Plan of Prominski Tract," which it *148 claims to be the "tentative" approval contemplated by the parties in the contract. Meadow asserts that the existence of this preliminary approval, bolstered by the testimony taken concerning the parties' contract negotiations, at least raises an issue of fact as to what the parties intended by use of the term in question. Deerhurst contends, in support of the trial court's decision, that both parties were experienced builders and developers, were ably represented by counsel, were fully aware of the statute  which was a repeated subject of discussion before the contract was executed  and that their use of the statutory language conclusively reflects an intention to give the words their technical meaning.
The trial judge correctly summarized our law as requiring, in the interpretation of a contract, an examination solely into that intent which is expressed or apparent in the writing. An actual intent which is not made known in the instrument will not be given effect. Corn Exchange, etc., Phil. v. Taubel, supra, 113 N.J.L., at p. 609; Casriel v. King, 2 N.J. 45, 50 (1949); New York Sash & Door Co., Inc. v. National House & Farms Association, Inc., 131 N.J.L. 466, 469 (E. & A. 1944); Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 302 (1953); 3 Williston, Contracts, § 610, p. 1750. Moreover, the law will not enforce a different contract than the parties have seen fit to express in their writing. Washington Construction Co., Inc. v. Spinella, 8 N.J. 212, 217 (1951).
But resolution of the issue at hand  whether use of the expression, "tentative approval," had reference to the Municipal Planning Act of 1953 or to the 1950 preliminary approval  is not dependent upon the parties' personal secret intentions. Even if the terms of the integrated writing, and this writing is concededly integrated, are clear and unambiguous, evidence of the surrounding circumstances and the situation of the parties is admissible in aid of interpretation. Casriel v. King, supra, 2 N.J., at p. 50; Basic Iron Ore Co. v. Dahlke, 103 N.J.L. 635, 638 *149 (E. & A. 1927); Alnor Construction Co. v. Herchet, 10 N.J. 246, 254 (1952); Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 427 (1956); Restatement, Contracts, § 230; 3 Williston, Contracts, § 609, p. 1747; 3 Corbin, Contracts (1951), § 542, p. 66. The only excluded circumstances are statements by the parties themselves as to what they intended the language to mean. Corn Exchange, etc., Phil. v. Taubel, supra, 113 N.J.L., at p. 609; Restatement, Contracts, § 230.
The settled primary standard of interpretation of an integrated agreement is the meaning that would be ascribed to it by a reasonably intelligent person who was acquainted with all of the operative usages and circumstances surrounding the making of the writing. Clott v. Prudential Ins. Co., 114 N.J.L. 18, 20 (Sup. Ct. 1934), affirmed 115 N.J.L. 114 (E. & A. 1935); Gusaeff v. John Hancock Mutual Life Ins. Co., 118 N.J.L. 364, 367 (Sup. Ct. 1937); Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 387 (E. & A. 1947); Restatement, Contracts, § 230. As an aid in ascertaining this meaning, prior negotiations are admissible, provided they tend to uncover an interpretation which the written words will bear. Restatement, Contracts, § 242; 3 Williston, § 630, p. 1808; 3 Corbin, Contracts, § 543, p. 72. The theory behind this primary standard is that since almost all language is susceptible of more than one reasonable construction, the attendant circumstances are always relevant in ascertaining the intended meaning. Corn Exchange, etc., Phil. v. Taubel, supra, 113 N.J.L., at p. 610.
Unless a rule of law attaches an established meaning to the parties' language, see Propper v. Colson, 86 N.J. Eq. 399, 401 (E. & A. 1916); Restatement, Contracts, § 234, the primary standard of interpretation must be abandoned where its application produces an ambiguous result. Restatement, Contracts, § 231. At this point a secondary standard is involved, under which a contracting party who manifests his intention ambiguously will generally be held *150 to that meaning that he induces another to understand and rely upon, provided he knows that the other will so understand. George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20, 28 (1954). Restatement, Contracts, § 233; 3 Corbin, § 538, p. 42; 3 Williston, Contracts, § 607, p. 1741.
In applying these standards, we are aided by certain rules, among which the following are here pertinent: (1) The ordinary meaning is to be given to words, unless circumstances show that a different meaning is applicable. (2) Technical terms and words of art should be given their technical meaning unless the context indicates otherwise. Corn Exchange, etc., Phil. v. Taubel, supra, 113 N.J.L., at p. 612; Restatement, Contracts, § 235(a), (b).
The trial judge determined as a matter of law that the parties had used "tentative approval" as a technical phrase, a word of art, and thus undoubtedly had reference to the statute. We cannot concur in the certainty with which the trial court reached its conclusions. We recognize that if the word of art used is an exclusively legal term and if the contract itself requires the application of a statute, all doubt is eliminated. Cf. Fischer & Porter Co. v. Porter, 364 Pa. 495, 72 A.2d 98, 101 (Sup. Ct. 1950). But we are reminded that "* * * more frequently * * * than in the case of ordinary language technical terms may be misused, and if the context of a writing or other relevant circumstances show that a technical word was not used in its ordinary technical sense, another meaning may be given. Moreover, the same word may have a variety of ordinary or of technical meanings." Restatement, Contracts, § 235, comment (c).
While it is true that the language, "tentative approval," appeared for the first time in the Municipal Planning Act of 1953, and thus took on a technical meaning previously unknown, examination of the history of the negotiations and the circumstances leading up to the execution of the contract *151 at hand raises a reasonable doubt as to whether the technical meaning was intended by these parties. In the first place, there is the preliminary approval which was obtained in 1950 by Meadow, and which conceivably could be described as a form of "tentative" approval. The fact that the warranty in question is worded in the past tense, i.e., "has been tentatively approved," gives further credence to the possibility that reference was intended to be made to a prior approval. It is at least inferable from the testimony concerning the contract negotiations that both parties were aware at the time of the signing of the contract that Meadow did not at that time have the "tentative approval" contemplated by N.J.S.A. 40:55-1.18.
Plaintiff urges that by considering this clause in the light of the purposes of the contract and the objects which the parties were striving to accomplish, it becomes clear that the statutory meaning was intended. Deerhurst reasons that the preliminary approval of 1950 would be of no avail in its planned development of the lots in question, and that to include in the contract a warranty of such approval would be senseless and superfluous. However, the trial judge's findings of fact give rise to precisely the opposite inference. While an ordinance of the Township of East Brunswick, dated April 14, 1953, provided minimum lot requirements greater than those specified in the 1950 Preliminary Plot Plan of the lands here involved, we note that Section II, para. 4(F) of the town's zoning ordinance of December 23, 1952 provided that "No requirement as to Major Lot Areas or Dimension Requirements shall apply to Developments, plot plan of which are (sic) on file with the Planning Board prior to final passage of this Ordinance." Although Section II, para. 4(F) was deleted by an amending ordinance on December 14, 1954, it was in effect at the time the contract between Meadow and Lenkowsky was signed. Thus, at the time of the execution of the contract, the preliminary approval of 1950, as preserved by the saving clause in the ordinance of 1952, could conceivably have convinced Deerhurst *152 that it need not comply with the lot-size requirements of the 1953 ordinance.
It is true that parties in New Jersey are presumed to contract with reference to existing law. Silverstein v. Keane, 19 N.J. 1, 13 (1955). But reference to such law is generally effected in cases of contract "construction," i.e., determination of the unexpressed implications of what is written, rather than in instances of "interpretation" of the written language. See 3 Corbin, Contracts, § 534, p. 6; 3 Williston, Contracts, § 602, p. 1728. The law of New Jersey is not a silent factor in every contract executed in this State in the sense that the statutory definitions, N.J.S.A. 1:1-2, govern the interpretation of every ambiguous phrase in a private agreement. With respect to the process of interpreting contractual language, statutes and common law principles are only part of the surrounding circumstances, and should be so considered. 3 Corbin, Contracts, § 551, p. 108; 3 Williston, Contracts, § 615, p. 1767.
Since the judge favored, as a matter of law, the interpretation advanced by Deerhurst, he declined to make findings of fact, based on the surrounding circumstances and on the parol evidence produced, of the parties' intention. Considering the use of the language in the instrument, and the purposes of the instrument as a whole, we cannot say that there exists no genuine issue of fact as to the meaning of the phrase, "tentative approval." Cf. Hudson County Newspaper Guild, etc. v. Jersey Pub. Co., 23 N.J. Super. 419, 426 (App. Div. 1952). While the construction of the terms of a contract may be a question for the court to decide, cf. Crest Drug Store, Inc. v. Levine, 142 N.J. Eq. 652, 655 (E. & A. 1948); Newark Publishers' Ass'n v. Newark Typographical Union, supra, where the meaning is unclear and depends upon disputed extraneous testimony, interpretation should be left to the determination of the finder of fact. The test was ably stated in Edge v. Boardwalk Securities Corp., 115 N.J.L. 286, 290 (E. & A. 1935):
*153 "Where the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury. The jury's function in the construction of documents will arise wherever, in view of the surrounding circumstances and usages offered in evidence, the meaning of the writing is not so clear as to preclude doubt by a reasonable man of its meaning. If the meaning, after taking the parol evidence, if any, into account, is so clear that no reasonable man could reach more than one conclusion as to the meaning of the writing under the circumstances, the court will properly decide the question of fact for itself, as it may any question of fact which is equally clear."
Michaels v. Brookchester, Inc., 26 N.J. 379, 387 (1958); Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 133 (1959); Ackerman v. Citron, 55 N.J. Super. 122, 129 (App. Div. 1959); 3 Williston, Contracts, § 616, p. 1772; 3 Corbin, Contracts, § 554, p. 119.
This cause will be remanded for a factual determination, based on the surrounding circumstances and on the relevant testimony concerning their negotiations, of the parties' respective understanding of the phrase, "tentative approval," at the time of its final insertion in section 3(b). If it is found that one of the parties used the term with knowledge or reason to know that the other contractor attributed a different meaning to it, the latter's interpretation will prevail and this action will be resolved accordingly. See Sardo v. Fidelity & Deposit Co. of Maryland, 100 N.J. Eq. 332, 334 (E. & A. 1926).
If judgment is once again entered in favor of Deerhurst, the question of interest will have to be resolved. In the interests of expedient and complete disposition, we will consider defendant's contentions herein. At the trial of the issue of damages, the judge disallowed plaintiff any interest on its judgment. This was a proper disposition under the rule of Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J. Super. 332, 341 (App. Div. 1956), where we held that "interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation, *154 or where a serious and substantial controversy exists as to the amount due under a contract."
But the judge construed Jardine as also requiring him to deny interest to defendant Meadow on its mortgage. At the time judgment below was formally entered, December 3, 1959, a principal balance of $14,475 was still owing from Deerhurst to Meadow on the note secured by the mortgage. Interest payments had not been made by Deerhurst after March 1, 1956, when litigation was first anticipated. The court credited the principal mortgage balance against the judgment, and also disallowed Meadow any interest payments, except for what had previously been paid. The judge explained that since defendant Meadow, by the effect of the judgment, was really not entitled to as much of the principal as it had previously received, its use of the excess principal during the period of the litigation was an ample substitution for the interest payments withheld by Deerhurst.
We must distinguish, at the outset, conventional or contractual interest from interest allowable as damages. The former is the compensation fixed by the parties for the use, detention, or forbearance of money or its equivalent. Wilentz v. Hendrickson, 133 N.J. Eq. 447, 468 (Ch. 1943), affirmed 135 N.J. Eq. 244 (E. & A. 1944). Since it is grounded in contract, being "part of the bargain that was struck when the loan was made," I Glenn on Mortgages (1943), § 90, p. 542, it is recoverable as of right along with the principal. 30 Am. Jur., Interest, § 68, p. 56 (1958). The interest withheld by Deerhurst over the period from March 1, 1956 to August 2, 1957, the due date of the mortgage, was obviously part of Deerhurst's contractual obligation. The trial court could not interfere with this contractual right, and committed error in disallowing interest to Meadow for this period.
The interest sought by Meadow for the period after the maturity date, however, is not conventional interest but interest in the form of damages for the illegal detention of a legitimate claim or indebtedness. See II *155 Glenn, Mortgages, § 164, p. 886. Fidelity Mutual Life Ins. Co. v. Wilkes-Barre & Hazelton R.R. Co., 98 N.J.L. 507, 510 (E. & A. 1923). True, Meadow's demand is liquidated and thus not subject to the prohibition of Jardine, supra. But our courts have held that interest does not run as a matter of right on a liquidated demand; rather, the trial judge is given broad discretion to allow interest in accordance with principles of equity. Agnew Co. v. Paterson Bd. of Education, 83 N.J. Eq. 49, 67, 68 (Ch. 1914), affirmed 83 N.J. Eq. 336 (E. & A. 1914); Hoover Steel Ball Co. v. Schaefer Ball Bearing Co., 90 N.J. Eq. 515, 517 (Ch. 1919); Warren Bros. Co. v. Hartford Accident & Indemnity Co., 102 N.J.L. 616, 619 (E. & A. 1926); Jardine Estates v. Donna Brook Corp., supra, 42 N.J. Super., at p. 340; Department of Mental Health of Commonwealth of Kentucky v. Mullins, 56 N.J. Super. 449, 463 (App. Div. 1959), affirmed 31 N.J. 598 (1960).
In the instant case, however, the equitable principles have been fused into an established rule of law. Where a claim under an agreement is certain and liquidated, but is reduced because of the allowance of an unliquidated set-off or counterclaim, interest may be allowed only on the balance due. Hoelzel v. Gavalas, 25 N.J. Misc. 191, 52 A.2d 54 (Sup. Ct. 1947); Jardine Estates v. Donna Brook Corp., supra, 42 N.J. Super., at p. 340. See Restatement, Contracts, § 337; Annotation, 89 A.L.R. 678 (1934); 15 Am. Jur., Damages, § 167, p. 584 (1938). We have held that the right to a set-off or counterclaim is not a natural and fixed right, but must be asserted affirmatively. Koppel v. Olaf Realty Corp., 62 N.J. Super. 103, 113 (App. Div. 1960). Deerhurst properly asserted this right in its complaint, whereby it professed to be entitled to "a set-off against defendant's claim under the aforementioned mortgage for so much of its claim for damages as may be necessary to discharge the said mortgage." The fact that the liquidated debt is here being set off against a larger unliquidated claim should not change the result. Meadow's liquidated claim *156 has been entirely subsumed by the unliquidated right of Deerhurst arising out of the same transaction. Interest to Meadow in the form of damages was therefore properly disallowed.
However, should the findings of the trial court on remand result in a determination adverse to Deerhurst, Meadow would then be entitled to interest on the unpaid mortgage balance. In accordance with the trial judge's order of August 26, 1959, at which time the mortgage was discharged upon plaintiff's deposit of sufficient funds with the clerk of the court, interest would then be computed at the rate of six per cent per annum from the maturity date, August 2, 1957, until the principal is paid.
The action is remanded for disposition not inconsistent with this opinion.